## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MONULITA S. BOEY,        )
                                 )
      **Plaintiff,**          )
                                 )
   **vs.**                 )   **Case number 4:09cv0405 TCM**
                                 )
MICHAEL J. ASTRUE,      )
**Commissioner of Social Security,**  )
                                 )
      **Defendant.**        )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J.

Astrue, the Commissioner of Social Security ("Commissioner"), denying Monulita S. Boey's

applications for disability insurance benefits ("DIB") under Title II of the Social Security Act

("the Act"), 42 U.S.C. § 401-433, and supplemental security income benefits ("SSI") under

Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the Court, see 28 U.S.C. § 636(c),

for a final disposition. Ms. Boey has filed a brief in support of her complaint; the

Commissioner has filed a brief in support of his answer.

## Procedural History

Monulita Boey ("Plaintiff") applied for DIB and SSI in September 2006, alleging she

was disabled as of September 15, 2002, due to partial paralysis and loss of a range of motion

in her right hand, severe pain in her left hand, muscular twitches, and numbness. (R.[1] 94-98,

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

100-03.)  Her applications were denied initially and after a hearing held in March 2008 before Administrative Law Judge ("ALJ") Joseph W. Warzycki.  (Id. at 5-63.)  The Appeals Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Vincent Stock, M.A., a vocational expert ("VE") testified at the administrative hearing.

Plaintiff testified that she is 33 years old, single, and lives in an apartment with her twelve-year old daughter and nine-year old son.  (Id. at 22, 23.)  She is five feet four inches tall and weighs 121 pounds, having gained thirty pounds in the past fifteen months.  (Id. at 22, 45.)  She has a high school education and has been trained as a certified nurse's assistant ("CNA").  (Id. at 24.)  She last worked as a CNA in 2002 and has since lost her certification.  (Id. at 25.)  She worked as a CNA for approximately two and one-half years.  (Id. at 28.)

Plaintiff has a driver's license, but does not drive and does not have a car.  (Id. at 23.)  She last drove a couple of weeks ago.  (Id.)

Plaintiff  stopped working because swelling in her feet prevented her from standing for long.  (Id. at 26.)  Her doctor has told her to elevate her feet when she is sitting.  (Id. at 45.)  Although she did not work as a CNA after 2002, she worked in 2004 stocking inventory at night for Target and in 2005 for a janitorial service.  (Id. at 26-27.)  The Target job required that she be on her feet and lift objects as heavy as fifty pounds.  (Id. at 27.)  The janitor job lasted approximately three weeks.  (Id.)  In addition to the CNA job, she had a

seasonal job in 2001 checking film for dust and threads.  (Id. at 28.)  She had applied for other, sit-down or part-time jobs, but was never hired.  (Id. at 29-30.)

Plaintiff's income is from her son's disability payments.  (Id. at 24.)  She receives food stamps and Medicaid.  (Id.)

Plaintiff testified that she gets up with her daughter at 5:40 a.m.  (Id. at 30-31.)  After her children leave for school, she lies down for at least four hours.  (Id. at 31.)  She tries then to do some chores, e.g., cleaning the bathroom, washing dishes, sweeping, and mopping.  (Id.)  She also does the cooking, laundry, and shopping.  (Id. at 31-32.)  She irons her children's clothes.  (Id. at 39-40.)  She might watch television.  (Id. at 32.)  Sometimes, she checks out a book from the library or uses the computer there.  (Id. at 32-33.)  When her children come home from school, she tries to help them with their homework.  (Id. at 34.)  Also, they watch television or play board games.  (Id.)  On weekends, they walk downtown, a walk of six to eight blocks, to go bowling.  (Id.)  When the weather is nice, they go to the park and the children fly kites.  (Id. at 35.)  She goes to bed between 11:00 p.m. and midnight.  (Id. at 31.)

When Plaintiff does chores, she has to rest after forty-five to sixty minutes.  (Id. at 46.)  She rests for thirty minutes.  (Id.)  On a bad day, she can do at best one chore.  (Id. at 47.)  On average, she has approximately five bad days a week and twenty to twenty-five bad days a month.  (Id.)  A good day is followed by a bad day.  (Id.)

Plaintiff does not belong to any organizations or churches.  (Id. at 34.)

Asked if she has any problems taking a shower, Plaintiff explained that it is hard sometimes for her to reach certain areas with her right hand. (Id. at 35.) She prefers to take a bath. (Id.)

Plaintiff takes 800-milligrams of ibuprofen once a day and Flexeril three times a day. (Id. at 36.) She also uses joint rub. (Id.) Her current medications do not have any side effects. (Id. at 37.)

Plaintiff's problems with her right arm began in 1994, when she had a cancerous lump removed. (Id. at 37-38.) The operation left her right arm partially paralyzed with a limited range of motion. (Id. at 38.) Also, she cannot twist her wrist or lift her right hand. (Id.) The numbness in her left arm and hand is unpredictable. (Id.) With her left hand, she can button buttons, zip zippers, comb her hair, use eating utensils, put on shoes and socks, and open a doorknob. (Id. at 39.) She cannot braid her hair. (Id.) The grip in her right hand is terrible. (Id.) She has to scoop change off the counter. (Id.) She does not have a problem following a recipe. (Id. at 40.)

In addition to the problems with her right arm, Plaintiff has degenerative arthritis in her neck, daily pain, and a pinched nerve, which makes her hands go numb. (Id. at 41.) She takes the ibuprofen for her neck. (Id.) Before she takes ibuprofen, the neck pain will be a ten on a ten-point scale; after it takes effect, the pain is a five or six. (Id. at 42.) Sometimes, pain radiates down the back of her spine. (Id.) On those days, she is immobile and lies down. (Id.) She has to switch positions from sitting to standing and lying down. (Id. at 45.) When not lying down, she sits in a reclined position for approximately thirty percent of the

time.  (Id. at 45.)  She does have problems sitting for long periods of time, e.g., thirty or

forty-five minutes.  (Id. at 43.)  At best, using both hands, she can lift no more than ten

pounds; using her left hand, she can lift fifteen to twenty pounds; and, using her right hand,

she can lift no more than five pounds.  (Id.)  She can bend, stoop, crouch, kneel, or crawl,

but it hurts her back.  (Id. at 44.)  If she tries to bend down, it hurts her neck.  (Id.)  She does

not have a problem climbing steps.  (Id.)  In response to questions from her counsel, Plaintiff

testified that a cyst on her knuckles that has developed during the previous four or five years

causes her sharp pains.  (Id.)  She had to  reschedule for the next day an appointment to have

the cyst removed.  (Id.)  Although she can turn her head, it is sometimes easier for her to turn

her whole body.  (Id. at 45.)

Plaintiff suffers "a little" from depression, but she sees a counselor.  (Id. at 42.)  She

does not constantly cry, have panic attacks, or have suicidal thoughts.  (Id. at 42-43.)  She

has not talked to a psychiatrist.  (Id. at 43.)

The VE described Plaintiff's past work in a clerical position and as a film editor as

light work.[2]  (Id. at 50-51.)  The ALJ then asked the VE to assume the following hypothetical

person: a 33-year old person with a high school education; past relevant work as described

by the VE; capable of performing the exertional requirements of light work, i.e., occasionally

lifting, carrying, pushing, or pulling twenty pounds; frequently doing so with ten pounds

with the left upper extremity and less than ten pounds with the right; combined sitting,

---

[2]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

standing, and walking for six out of eight hours in an eight-hour workday; limited to occasional fine manipulation with the right upper extremity; limited to not climbing ladders, ropes, or scaffolds; and who would not have the use of her right upper extremity for less than one-third of the day. (Id. at 51-52.) The VE testified that such a person could perform Plaintiff's past clerical and film editing work. (Id. at 52.) Plaintiff's other past work would not be available to such a hypothetical person. (Id.) Additionally, such a person could work as a parking lot attendant position, of which there were 4,000 positions available in the state economy. (Id. at 53.) If, on the other hand, the person had to elevate her feet when seated, she could not do any of the jobs identified by the VE. (Id.) If the person needed to rest or had the other limitations described by Plaintiff, she would have a hard time maintaining full-time employment. (Id.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, and records from various health care providers.

When applying for DIB and SSI, Plaintiff completed a Disability Report, describing her disabling impairments as partial paralysis and loss of motion in her right hand, numbness, and severe pain in her left hand. (Id. at 117- 24.) These impairments prevented her from sitting or standing for long periods of time, caused her feet to swell if she sat longer than thirty minutes without elevating her feet, resulted in spasms in her right hand if she tried to lift anything heavier than thirty pounds, and caused her right hand to become numb if she

held something for longer than ten minutes.  (Id. at 118.)  Her impairments first bothered her on September 15, 2002, and prevented her from working that same day, although she tried to continue working, for instance by working fewer hours and changing job duties.  (Id.)  Even so, she had work absences due to the swelling in her feet and legs.  (Id.)  She finally stopped working on September 15, 2005.  (Id.)  Plaintiff listed nine jobs held since Fall 1996.  (Id. at 119.)  The job she had held the longest was as a CNA.  (Id.)

In another Disability Report, Plaintiff reported that her impairments first bothered her on August 20, 2002.  (Id. at 125-34.)

In a Function Report, Plaintiff described her day as beginning when she gets her children ready for school.  (Id. at 142-49.)  She irons their clothes, walks with them to the bus stop and then walks back home, drinks a protein drink, takes a vitamin and pain medication, and then lies down unless she has to shop for necessities.  (Id. at 142.)  When her children return, she helps them with their homework.  (Id.)  She then again takes pain medication and lies down until it is time to prepare dinner.  (Id.)  After dinner, she lies down with a heating pad.  (Id.)  At approximately 8:00 in the evening, she makes sure her children have bathed.  (Id.)  She takes pain medication and lies down.  (Id.)  If she does not take pain medication or a muscle relaxer, she will be unable to sleep.  (Id. at 143.)  She prepares breakfast on some weekend mornings and a complete dinner three to four times a week.  (Id. at 144.)  She prepares some meal every day.  (Id.)  She is able to clean, wash dishes, iron, do the laundry, and vacuum.  (Id.)  This takes her an hour a day once or twice a week.  (Id.)  When she does go outside, she drives a car.  (Id. at 145.)  Once or twice a week, for thirty

to forty-five minutes each time, she shops for groceries, household necessities, and clothing for her children.  (Id.)  Plaintiff likes to read and watch television.  (Id. at 146.)  On weekends, she goes to the park with her children and feeds the ducks.  (Id.)  She used to play basketball with her children, but can no longer due to the cramps in her left hands.  (Id.)  Also, she can no longer walk for long periods of time.  (Id.)  If she is rested, the farthest she can walk is three blocks.  (Id. at 147.)  She only walks when she is shopping.  (Id.)  The only places she goes to on a regular basis are to parent-teacher meetings.  (Id. at 146.)  She does not have any problems getting along with other people, and she can pay attention as long as necessary.  (Id. at 147.)  She does not belong to any social groups.  (Id.)  Her impairments have affected her ability to lift, stand, walk, sit, and use her hands.  (Id.)  She follows written and spoken instructions "very well."  (Id.)  She does not handle stress or changes in routine well.  (Id. at 148.)  She wears a brace daily on her right hand.  (Id.)  The brace was made for her in 1994 after her surgery.  (Id.)

Plaintiff explained in a Disability Report – Appeal form that the numbness in her left small and middle fingers had increased and the pain in her back was more severe since she had filed her applications.  (Id. at 158-64.)  She had not seen a doctor or gone to a hospital or clinic.  (Id. at 159.)  Her illnesses, injuries, or conditions did not affect her ability to care for her personal needs.  (Id. at 162.)  There had been no changes in her daily activities since she had last completed a disability report.  (Id.)

Pursuant to her applications, an earnings report was generated for Plaintiff for the period from 1991 to 2005, inclusive.  (Id. at 104.)  Her highest annual earnings were

$14,104, in 2001.  (Id.)  Her annual earnings in 2002 were $7,100.99; in 2004 were $1,019.28; and in 2005 were $474.25.  (Id.)  She had no reportable earnings in 2003.  (Id.)

Plaintiff's work attempts after September 15, 2002, were considered unsuccessful work attempts.  (Id. at 141.)  Consequently, that date was to be her proposed disability onset date.

The medical records before the ALJ are summarized below, in chronological order.

Plaintiff was hospitalized on March 16, 1994, for a fever after being diagnosed the previous month with synovial sarcoma[3] and after having undergone chemotherapy.  (Id. at 169-82, 190-99, 202-12.)  It was noted that the tumor on her right forearm was approximately eight to ten centimeters.  (Id. at 170.)  A chest x-ray was negative.  (Id. at 173-74.)  She was started on a course of antibiotics and released on March 20.  (Id. at 170-72.)

Plaintiff returned to the hospital on April 12 for a wide resection of her sarcoma, following which she was given a wrist splint to help her radial nerve palsy.  (Id. at 183-88.)  She was discharged on April 16 "in good condition."  (Id. at 184.)  Less than two weeks later, Plaintiff had a course of post-operative radiotherapy.  (Id. at 200-01.)

The next medical record is from August 18, 2003, when Plaintiff went to the emergency room at St. Louis University Hospital after she felt a burning sensation in a mass

---

[3]Synovial sarcoma "is type of soft tissue sarcoma," a slow-growing tumor, occurring primarily in young adults, most commonly treated by surgery, and is usually accompanied by a swelling or mass that is tender or painful.  National Cancer Institute, Synovial Sarcoma: Questions and Answers, http://www.cancer.gov/templates/doc.aspx?viewid=5B6A9BCC-80A4-4FBF-B7C2-7E07D5BD4798 (last visited Mar. 4, 2010).

under her left arm that had been present for the past two months and had not improved with over-the-counter medication.  (<u>Id.</u> at 218-22.)  She denied any nausea, vomiting, diarrhea, or cramping.  (<u>Id.</u> at 220.)  She left without being seen by a doctor.  (<u>Id.</u> at 219.)

Plaintiff did see a doctor, on September 12, 2006, – two weeks before applying for DIB and SSI – when she went to the Wohl Medical Clinic ("the Clinic") emergency room with complaints of left arm pain that had begun the month before.  (<u>Id.</u> at 224-30.)  She had no nausea or vomiting.  (<u>Id.</u> at 225.)  She was calm, cooperative, and alert and oriented to time, place, and person.  (<u>Id.</u>)  She was treated with acetaminophen with codeine and discharged.  (<u>Id.</u>)

Six days later, Plaintiff saw Kabekode Bhat, M.D., at the Clinic for her left arm pain.  (<u>Id.</u> at 237-43, 277-85.)  An x-ray of her left forearm was normal; other than revealing the earlier resection, the right forearm x-ray was also normal.  (<u>Id.</u> at 248-49.)  She reported that she had no difficulty walking or taking care of her personal needs.  (<u>Id.</u> at 238.)  She smoked one-half pack of cigarettes a day, and had done so for the past four years.  (<u>Id.</u>)  She was prescribed Tylenol with codeine.  (<u>Id.</u> at 240.)

On October 3, Plaintiff was given a prescription for acetaminophen with codeine and cyclobenzaprine, a muscle relaxer.  (<u>Id.</u> at 154.)

A chest x-ray taken on October 5 was normal.  (<u>Id.</u> at 247.)  A magnetic resonance imaging ("MRI") scan on October 9 revealed a small lesion on her right arm near the elbow.  (<u>Id.</u> at 246.)  A breast ultrasound and mammogram done the next day were both normal.  (<u>Id.</u> at 244, 245.)  It was noted during Plaintiff's visit to Dr. Bhat on October 13 that she had a

painful mass in her right arm and a history of weight loss. (Id. at 235-36, 270-76.) Her pain was a three on a ten-point scale. (Id. at 270.)

Plaintiff was evaluated on October 19 by Timothy Buchman, M.D., after experiencing weight loss and night sweats for four months. (Id. at 231-35.) There was a concern that both could indicate a malignancy. (Id. at 231.) It was noted that neither the MRI nor the mammogram suggested any malignancy. (Id.)

On November 27, Plaintiff again saw Dr. Bhat. (Id. at 267-68.) Dr. Bhat noted that until seeing Plaintiff two months earlier for fatigue, loss of appetite, and night sweats, she had not seen a doctor for several years. (Id. at 267.) Dr. Bhat recounted that the surgeon who had performed the resection in 1994 had thought the mass on the MRI was not a recurrence and had referred Plaintiff back to the breast center. (Id.) The doctor at the breast center had told her that her breast tissue was normal. (Id.) Plaintiff continued to have low blood pressure, which had improved on Flexeril and with the use of heating pads. (Id.) She had stopped taking Tylenol with codeine because it caused a rash on her jaw and chest and blisters on her fingers. (Id.) The rash had not gone away when she discontinued taking the Tylenol. (Id.) She occasionally took Oxycodone given to her by relatives. (Id.) Dr. Bhat also noted that Plaintiff was anxious about her health problems, had back problems made worse with sitting, was depressed and with sleep problems, had poor concentration, and had low interest. (Id. at 68.) Dr. Bhat referred her to a Dr. McDonald for assessment for a biopsy. (Id.) She further recommended that Plaintiff have an electrocardiogram ("EKG") to evaluate her tachycardia, prescribed Effexor for depression, continued her on Flexeril for

her low back pain, and recommended ibuprofen and the use of heating pads as needed.  (Id.)

Plaintiff was to return in one to two months.  (Id.)

Plaintiff returned to Dr. Bhat on January 28, 2007.  (Id. at 265-66.)  Dr. Bhat noted that Dr. McDonald had thought the mass in her right arm was scarring and referred her to a hand surgeon for the tingling in left arm.  (Id. at 265.)  Plaintiff reported that the Effexor had made her feel "jittery," so she stopped taking it; her appetite and mood had then improved.  (Id.)  She also reported that her night sweats had increased in frequency and intensity and that the Flexeril had helped her back pain.  (Id. at 266.)  She was particularly concerned with the back pain, and the physical therapist had told her that she could not participate in therapy if she had spine problems.  (Id.)  She had an appointment at the hand clinic the next month.  (Id.)

When Plaintiff again saw Dr. Bhat, on March 21, she said she continued to have neck and back pain, stiffness, and pain in her arms when she moved her neck.  (Id. at 263-64.)  The pain had become worse over the past three months and was worst in the morning.  (Id. at 263.)  On examination, she had a full range of motion in her neck, but appeared stiff.  (Id.)  She had some slight point tenderness at C4-C5.  (Id.)  Although the Flexeril was not helping her back pain, she did not want another pain medication.  (Id.)  She also did not want an anti-depressant.  (Id.)  She wore a back brace to help the ulnar nerve compression.  (Id.)  Dr. Bhat advised her to resume taking the Flexeril.  (Id.)  A notation to check the x-ray films of her cervical spine is included.  (Id.)  She was to return in three months.  (Id.)

In June, Plaintiff reported to Dr. Bhat that ibuprofen helped. (Id. at 260-62.) Also, the Flexeril helped her relax. (Id. at 261.) She still did not want to take an anti-depressant. (Id.) She was in no acute distress and was pleasant, but sad. (Id.) She still had neck and back pain and was stiff. (Id.) She did not want any anti-depressants or any additional pain medication. (Id.) She continued to wear a brace at night. (Id.) She had increasing episodes of syncope (fainting); Dr. Bhat discussed with her avoiding the triggers that caused such. (Id.) "[N]eck films show DJD [degenerative joint disease]" is in parentheses. (Id.)

Plaintiff next saw Dr. Bhat in September for complaints of back pain in her neck region. (Id. at 258-59.) She did not want to take any medication for it. (Id. at 258.) She had swelling in her feet and hands; she liked salty foods. (Id.) Dr. Bhat gave her some home exercises because her insurance would not pay for physical therapy. (Id.) Plaintiff reported that she was improved, as was her appetite and ability to concentrate. (Id.) She was avoiding the triggers that caused the syncope and no longer had any. (Id.)

Plaintiff stated to Dr. Bhat on December 11 that she frequently had cramps in her calves and was recently bothered by stiffness in her neck. (Id. at 256-57.) Her mood had significantly improved. (Id. at 256.) Dr. Bhat was to check for hypokalemia to determine if that was the cause of her leg cramps; Plaintiff was to return in six months. (Id. at 257.)

Two months later, in February 2008, Dr. Bhat completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) ("MSS") on Plaintiff's behalf. (Id. at 286-88.) She reported that Plaintiff's ability to lift and carry was affected by her history of synovial sarcoma, her left ulnar nerve compression, and her degenerative joint disease at C3-

C7.  (Id. at 286.)  Her ability to stand and walk was also affected by her degenerative joint disease; specifically, she could do neither for longer than a total of two to four hours during an eight-hour day and could not do either for longer than one hour without interruption.  (Id.) Her ability to sit was affected by her degenerative joint disease and her complaints of stiffness in her neck and back.  (Id. at 287.)  She could sit for no longer than six hours in an eight-hour workday and for no longer than one hour without interruption.  (Id.)  On examination, she had a poor range of motion.  (Id.)  She should restrict her driving, climbing, balancing, stooping, crouching, crawling, and kneeling.  (Id.)  The unpredictable numbness in her hands and poor strength in her upper extremities, particularly her right, restricted her ability to reach, handle, feel, push, and pull.  (Id.)  These restrictions and limitations were permanent.  (Id. at 288.)

### The ALJ's Decision

After summarizing Plaintiff's hearing testimony and her 1994 medical records, the ALJ noted that Plaintiff had filed DIB and SSI applications in February 1994, alleging a disability as of January 1994.  (Id. at 10.)  Those applications had been denied initially, on reconsideration, and after an administrative hearing.  (Id.)  The Appeals Council had affirmed the denial in October 1996.  (Id.)  A second application for SSI was filed in 1997 and was not pursued after the initial denial.  (Id.)  Noting that Plaintiff had alleged a disability onset day eight years after the sarcoma surgery, the ALJ found that there was no good cause to disturb the decision on Plaintiff's 1994 applications.  (Id.)

The ALJ then summarized the medical evidence, including the lack of any medical treatment between May 1994 and August 2003; the gap between August 2003, when Plaintiff left the emergency room without receiving medical attention, and September 2006, when she returned to the emergency room. (Id. at 11.) The subsequent medical evidence revealed no evidence of a new malignancy; low back pain that was managed with ordinary pain medication, a heating pad, and prescribed home exercises; a rash and tachycardia (rapid heart beat), neither of which persisted; depression for which Effexor was initially prescribed, followed by an improved mood and her declining any more anti-depressants; several fainting episodes that stopped when she learned to avoid certain aggravating situations; tingling and numbness in her left upper extremity – ulnar nerve compression – that was successfully managed with a brace; back and neck pain, both relieved by Flexeril, according to Plaintiff; an isolated report of swelling in her hands and feet; and a headache, but a CT scan of her head was negative. (Id.)

The ALJ next summarized Dr. Bhat's[4] conclusions about Plaintiff's RFC. (Id. at 11-12.) He then assessed her RFC in her right upper extremity as lifting or carrying less than ten pounds with her right hand and doing no more than occasional reaching, overhead work, or fine manipulation with that hand. (Id. at 12.) She should not climb ropes, ladders, or scaffolds. (Id.) With her RFC, Plaintiff could perform light work. See note 2, supra.

---

[4]Dr. Bhat's last name is misspelled "Shat" by the ALJ.

Restricted to light work, Plaintiff could preform her past relevant jobs as a film editor and clerical worker. (Id.) Moreover, if she could not perform these jobs, the VE testified that she could perform a parking attendant job. (Id. at 13.)

The ALJ discounted a need expressed by Plaintiff to elevate her feet often during a work day. (Id. at 12.) Assessing her credibility, he noted that she had testified that she had "little overall functional use loss of her hands and fingers." (Id.) She could use kitchen utensils, comb her hair, fasten buttons and zippers, and do a full range of kitchen chores. (Id.) Although she had some degenerative disc disease in her cervical, not lumbosacral, spine, there was no objective medical basis to support Dr. Bhat's conclusions about her standing, sitting, and walking limitations. (Id.) The ALJ noted that no physician who had treated or examined Plaintiff had implied or stated that she was disabled or totally incapacitated. (Id.) Plaintiff had not alleged any problem with her left arm until August 2003 and not again until September 2006. (Id.) She did not have regular medical attention or treatment until September 2006, and had none for 2004 and 2005, the two years she worked after her alleged disability onset date. (Id.) There was no evidence that the lack of medical treatment was caused by any inability to pay. (Id.) Plaintiff had no adverse side effects from her medication. (Id. at 13.) She had no inability to walk or perform fine and gross movements on a sustained basis. (Id.) She had no credible, medically-established mental or mood disorder that would prevent her from doing ordinary work. (Id.) To the extent her daily activities were restricted, they were so by choice. (Id.)

Being able, physically and mentally, to perform her past relevant work, Plaintiff was not disabled within the meaning of the Act. (Id. at 13-14.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential

evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d), and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a

sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE in response to "a properly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997). "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)). Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question. **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001). Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **<u>Id.</u>**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

**Discussion**

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because he improperly assessed her RFC and her past relevant work.

Plaintiff first contends that there is no medical evidence to support the ALJ's RFC findings and that the ALJ improperly substituted his own medical conclusions for those of Dr. Bhat. After seeing Plaintiff eight times, during the period from September 2006 to December

2007, Dr. Bhat opined that Plaintiff's ability to stand and walk was limited to two to four hours during an eight-hour work day and her ability to sit was limited to six hours. Moreover, she had a poor range of motion, had postural limitations, and had a limited ability to push, pull, handle, and reach. Although limiting Plaintiff to light work, see note 2, supra, the ALJ's RFC did not incorporate Dr. Bhat's conclusions.

It is undisputed that Dr. Bhat was Plaintiff's treating physician. "'The [social security] regulations provide that a treating physician's opinion . . . will be granted 'controlling weight' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001) (quoting <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alteration in original); <u>accord</u> **Cox v. Barnhart**, 471 F.3d 902, 907 (8th Cir. 2006); **Goff**, 421 F.3d at 790. The longer a claimant's health care provider has treated her and the more times, the more weight is given to that provider's opinion. 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i). And, the more knowledge a physician has about the claimant's impairments, the more weight is to be given to that physician's medical opinion. 20 C.F.R. §§ 404.1527(d)(2)(ii), 416.927(d)(2)(i). The treatment provided and the "kinds and extent of examinations and testing the [physician] performed or ordered from specialists and independent laboratories " are relevant to the weight to be given the treating physician's opinion. <u>Id.</u> "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. §§ 404.1527(d)(2)(iii),

416.927(d)(2)(iii). "[T]he more consistent an opinion is with the record as a whole, the more weight . . . will [be] give[n] that opinion." 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4). Thus, "[a]lthough a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.'" **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996)). Accordingly, "[t]he weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements." **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). See also **Charles v. Barnhart**, 375 F.3d 777, 784 (8th Cir. 2004) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); accord **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996).

When Plaintiff first saw Dr. Bhat, one week before applying for DIB and SSI, she informed her that she had no difficulty walking. Two months later, Dr. Bhat noted Plaintiff's report of back problems made worse by sitting. Again complaining of back pain, in March 2007, Plaintiff had a full range of motion and did not want any pain medication. Three months later, Plaintiff informed Dr. Bhat that ibuprofen, an over-the-counter medication, helped. With the exception of an x-ray that apparently showed degenerative disc disease[5] and an MRI that showed a small lesion in her right arm, diagnostic tests were negative. See **Robson v. Astrue**, 526 F.3d 389, 393 (8th Cir. 2008) (noting that controlling weight need not be given to a treating physician's retrospective opinion when that opinion is not supported by

---

[5]The x-ray itself is not included in the record.

diagnostic testing).  Thus, it is clear from Dr. Bhat's MSS that she was relying on Plaintiff's

subjective complaints for her conclusions.[6]  With such a foundation, Dr. Bhat's conclusions

did not control the ALJ's RFC findings.[7]  See **Finch**, 547 F.3d at 937 (finding that, although

"[a]n ALJ must not substitute his opinions for those of the physician," "[t]he ALJ may reject

the opinion of any medical expert where it is inconsistent with the record as a whole")

(second alteration in original) (internal quotations omitted); **Hamilton v. Astrue**, 518 F.3d

607, 610 (8th Cir. 2008) (noting that "a treating physician's opinion does not deserve

controlling weight when it is nothing more than a conclusory statement"); **Brown v. Chater**,

87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement

as to claimant's limitations because such conclusion apparently rested solely on claimant's

complaints).

"Even though the RFC assessment draws from medical sources for support, it is

ultimately an administrative determination reserved to the Commissioner."  **Cox v. Astrue**,

---

[6]The ALJ found Plaintiff's subjective complaints not to be fully credible.  This finding, not specifically challenged by Plaintiff, is supported by the record.  She alleged a disability onset date that occurred during a twelve-year period in which she had no medical treatment.  See **Chamberlain**, 47 F.3d at 1495 ("Failure to seek aggressive medical care is not suggestive of disabling pain.").  She quit work in 2005, but there was no aggravating or precipitating factor; indeed, there are no contemporaneous medical records from 2004 or 2005.  See **Travis v. Astrue**, 477 F.3d 1037, 1042 (8th Cir. 2007).  She reported that she was seeing a counselor, there are no records of such visits.  She reported she had an appointment at a hand clinic, there is no record of such a visit.  She complained of back and neck pain, yet refused any prescription pain medication.  See **Hepp v. Astrue**, 511 F.3d 798, 807 (8th Cir. 2008) (affirming ALJ's adverse credibility findings in case in which claimant took only over-the-counter pain medication).

[7]Plaintiff argues that any doubts about the validity of Dr. Bhat's conclusions should be resolved by contacting Dr. Bhat.  An ALJ need not, however, contact a treating physician whose opinion is not supported by the record.  See **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007).

495 F.3d 614, 620 (8th Cir. 2007). The ALJ's assessment of Plaintiff's RFC is supported by substantial evidence on the record as a whole.

Plaintiff next argues that the ALJ erred in finding that she could perform her past relevant work as a film editor or clerical worker.[8] The ALJ further found that Plaintiff could perform work as a parking lot attendant, jobs which the VE testified existed in significant numbers in the state economy.

The job of a parking lot attendant is light work. Dictionary of Occupational Titles, 915.473-010, 1991 WL 687865 (4th ed. rev. 1991). Consistent with the Plaintiff's RFC, as determined by the ALJ, it does not require climbing, or any other activity precluded by that RFC. Id.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."

---

[8]Plaintiff quarrels with the ALJ's conclusion that she could return to her past relevant work as a film editor on the grounds that he did not make the necessary, supporting explicit findings. The job of film editor, as defined in the Dictionary of Occupational Titles ("DOT"), is light work, but requires more than four years vocational preparation and a high degree of verbal aptitude. See DOT, 962.262-010, 1991 WL 688446 (4th ed. rev. 1991). Plaintiff's brief description of a seasonal job checking film for dust and threads is clearly not that of a film editor. As noted below, however, the ALJ also found that she could perform the job of a parking lot attendant as that job is defined in the DOT. Thus, any error relating to the film editor position did not have a "bearing on the outcome" and is not grounds for remand and reversal. See **Hepp**, 511 F.3d at 806.

**Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted).

Accordingly,

     **IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

     An appropriate Judgment shall accompany this Memorandum and Order.




                  /s/ Thomas C. Mummert, III
                  THOMAS C. MUMMERT, III
                  UNITED STATES MAGISTRATE JUDGE


Dated this  9th  day of March, 2010.